UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JETBLUE AIRWAYS CORPORATION, and LIVE TV, LLC,<br><br>            Plaintiffs,<br><br>v.<br><br>VISA, INC.; VISA U.S.A., INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; and MASTERCARD INTERNATIONAL INCORPORATED,<br><br>            Defendants. | Case No.<br><br><br>**COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

**Page**

I.      NATURE OF ACTION ...................................................................................................1

II.     PLAINTIFFS .................................................................................................................2

III.    DEFENDANTS ..............................................................................................................3

IV.     CO-CONSPIRATORS....................................................................................................5

V.      JURISDICTION .............................................................................................................6

VI.     VENUE...........................................................................................................................7

VII.    DEFINITIONS................................................................................................................8

VIII.   TRADE AND COMMERCE ........................................................................................14

IX.     INJURY TO CONSUMER WELFARE AND COMPETITION ....................................14

X.      RELEVANT MARKET.................................................................................................18

XI.     FACTUAL ALLEGATIONS ........................................................................................20

        COUNT I CONSPIRACY IN RESTRAINT OF COMPETITION AGAINST
        VISA (RE: INTERCHANGE FEES).................................................................................27

        COUNT II CONSPIRACY IN RESTRAINT OF COMPETITION AGAINST
        MASTERCARD (RE: INTERCHANGE FEES)................................................................30

        COUNT III VISA'S MONOPOLIZATION.....................................................................32

        COUNT IV MASTERCARD'S MONOPOLIZATION....................................................33

        COUNT V ATTEMPTED MONOPOLIZATION BY VISA ...........................................34

        COUNT VI ATTEMPTED MONOPOLIZATION BY MASTERCARD.......................35

        COUNT VII VIOLATIONS OF STATE ANTITRUST AND  UNFAIR
        COMPETITION LAWS BY VISA ................................................................................36

        COUNT VIII VIOLATIONS OF STATE ANTITRUST AND UNFAIR COMPETITION
        LAWS BY MASTERCARD ..........................................................................................40

XII.    PRAYER FOR RELIEF ...............................................................................................44

XIII.   JURY DEMAND ..........................................................................................................45

i

Plaintiffs, JetBlue Airways Corporation and Live TV, LLC, (collectively "Plaintiffs"), bring this civil antitrust action against defendants Visa U.S.A. Inc., Visa International Service Association, and Visa, Inc. (collectively "Visa"), MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard"), under the antitrust laws of the United States, and various state antitrust laws and unfair competition laws.  For their complaint, Plaintiffs state as follows:

## I.      NATURE OF ACTION

1.      This is a civil antitrust action challenging two horizontal combinations, conspiracies or agreements.  One horizontal combination, conspiracy or agreement has been entered into by Visa and its co-conspirator member banks.  A second illegal horizontal combination, conspiracy or agreement has been entered into by MasterCard and its co-conspirator member banks.  In both cases, Visa and MasterCard have each agreed with their respective bank members to: (1) fix, set and enforce Interchange Fees (defined below) associated with general and premium credit cards and paid by merchants such as Plaintiffs; and (2) eliminate Plaintiffs' ability to negotiate lower Interchange Fees through a set of restraints incorporated in the network rules of Visa and MasterCard known as: (i) the "No Surcharge" rule; (ii) the "No Discount" rule; (iii) the "Honor All Cards" rule; (iv) the "All Outlets" rule; (v) the "No Bypass" rule; and (vi) the "No Multi-Issuer" rule.  These horizontal combinations have unreasonably restricted competition in the alleged relevant markets (which are defined below) and have allowed Visa and MasterCard to extract supracompetitive, artificially inflated Interchange Fees from Plaintiffs.  In addition to these illegal horizontal combinations, Visa and MasterCard have each monopolized, or attempted to monopolize, a relevant market for network services (described below) through a set of restraints which create barriers to entry and are designed to exclude competition from other sellers of such services.  This has enabled both Visa

1

and MasterCard to extract monopoly rents and maintain monopoly power in a relevant economic market.  Plaintiffs seek damages from January 1, 2004 through November 27, 2012 ("Relevant Time Period"),[1] and, contingent on the final approval or disapproval of the class action settlement pending in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, Case No. 05-MDL-1720 ("Interchange Fee MDL") in the Federal District Court for the Eastern District of New York (the "Class Action Settlement"), injunctive and other relief.

## II.    PLAINTIFFS

2.     Plaintiff, JetBlue Airways Corporation ("JetBlue") is a Delaware corporation with its principal place of business in Long Island City, New York.  Plaintiff owns and operates a commercial airline, and related businesses, at which Visa and MasterCard debit cards and credit cards (collectively, "payment cards") are accepted as payment for goods and services.  JetBlue has directly paid supracompetitive, artificially inflated Interchange Fees in the United States to members of each of the illegal horizontal conspiracies alleged herein; has sustained injury and damage as a result of the unlawful conduct of defendants and their co-conspirators; and, contingent on the final approval or disapproval of the class action settlement pending in the Interchange Fee MDL, is threatened with further loss or damage.  JetBlue has timely and properly elected to exclude itself from the Rule 23(b)(3) settlement class in the Interchange Fee MDL and thus, the claims alleged in this complaint are not subject to any release in that litigation.

---

[1]    Plaintiffs specifically reserve the right to seek damages beyond November 27, 2012, including to the present, in the event that the release and/or injunctive relief associated with the Rule 23(b)(2) settlement class in the Interchange Fee MDL is invalidated or modified in any pertinent way.

2

3.      Plaintiff, Live TV, LLC ("Live TV"), is an Illinois corporation with its principal place of business in New York, New York.  Plaintiff owns and operates retail multi-media related businesses, at which Visa and MasterCard debit cards and credit cards (collectively, "payment cards") are accepted as payment for goods and services.  Live TV has directly paid supracompetitive, artificially inflated Interchange Fees in the United States to members of each of the illegal horizontal conspiracies alleged herein; has sustained injury and damage as a result of the unlawful conduct of defendants and their co-conspirators; and, contingent on the final approval or disapproval of the class action settlement pending in the Interchange Fee MDL, is threatened with further loss or damage.  Live TV has timely and properly elected to exclude itself from the Rule 23(b)(3) settlement class in the Interchange Fee MDL and thus, the claims alleged in this complaint are not subject to any release in that litigation.

4.       Plaintiffs JetBlue and Live TV are sometimes collectively referred to herein as "Plaintiffs," "merchants," or "retail merchants."

### III.    DEFENDANTS

5.      Prior to a March 19, 2008 initial public offering ("IPO"), defendant **Visa U.S.A., Inc.** was a member of defendant **Visa International Service Association** and was a non-stock Delaware membership corporation with its principal place of business in San Francisco, California.  It was a national bank-card association whose members included approximately 14,000 banks.  During the Relevant Time Period and until the Visa corporate re-structuring on March 19, 2008, Visa U.S.A., Inc. was governed by a board of directors composed of bank executives selected from its member banks.

6.      Prior to March 19, 2008, defendant **Visa International Service Association** was a non-stock Delaware membership corporation with its principal place of business in Foster City, California.  On March 19, 2008, the Visa entities completed an IPO.  Under a series of

transactions that culminated in the IPO, Visa U.S.A., Inc. and Visa International Service Association became subsidiaries of defendant **Visa, Inc.**, a Delaware corporation, with its principal place of business in San Francisco, California.  After the subsidiaries were unified under the ownership of Visa, Inc., the stock of the former members in each subsidiary was acquired by Visa, Inc.  Once the restructuring was completed, Visa, Inc. conducted an IPO of over 400,000,000 shares of class A common stock.  Visa, Inc. acquired the ownership interest of certain member banks in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks.  Each of the Visa defendants is and has been an active, knowing participant in the Visa activities alleged below.  Defendants **Visa International Service Association**, **Visa U.S.A., Inc.**, and **Visa, Inc.** are collectively referred to herein as "Visa."  Visa transacts business in this judicial district and throughout the United States.

7.    Defendant **MasterCard Incorporated** is a Delaware corporation with its principal place of business in Purchase, New York.  Defendant **MasterCard International Incorporated** is a non-stock membership corporation and the principal operating subsidiary of MasterCard Incorporated and has its principal place of business in Purchase, New York.  The members of defendant MasterCard International Incorporated are Issuing and Acquiring Banks as defined herein.

8.    Prior to the week of May 22, 2006, 100% of the stock of MasterCard Incorporated was owned and controlled by the bank members of defendant **MasterCard International Incorporated**.  During the week of May 22, 2006, MasterCard Incorporated acquired from MasterCard International Incorporated members and then sold to the public some of the stock it acquired.  Pursuant to the terms of that IPO, the members of MasterCard International

4

Incorporated retained operating and effective control of MasterCard Incorporated.  Specifically, subsequent to the IPO, the member banks of MasterCard International Incorporated own 51% of the Class A voting stock of MasterCard Incorporated and hold additional shares of Class B and Class M stock, which confer on the member banks additional rights to control the business of MasterCard Incorporated.  As a practical matter, MasterCard Incorporated previously was and remains effectively owned and controlled by the 25 member banks that issue approximately 98% of the MasterCard payment cards issued to cardholders in the United States and acquire over 95% of all MasterCard transactions from retail merchants.  Both MasterCard Incorporated and MasterCard International Incorporated are and have been active and knowing participants in the illegal activity alleged herein.  MasterCard Incorporated and MasterCard International Incorporated are hereinafter collectively referred to as "MasterCard."  MasterCard transacts business in this judicial district and throughout the United States.

## IV.   CO-CONSPIRATORS

9.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  The co-conspirators include, but are not limited to, the following: (a) thousands of Issuing Banks that have issued Visa and/or MasterCard payment cards and have agreed to set, fix and enforce through anticompetitive rules and restraints Visa and/or MasterCard Interchange Fees; (b) banks that are or were members of the Boards of Directors of Visa or MasterCard and specifically adopted and agreed to impose the challenged rules and restraints upon retailers; and (c) thousands of banks that are Acquiring Banks who acquire Visa and MasterCard transactions from merchants and who agreed to and have imposed the anticompetitive rules and restraints on the merchants.

010237-21  655065 V1

10.     Merchants, including Plaintiffs, purchase General Purpose Credit Card Network Services (defined below) from Visa and MasterCard through the Acquiring Bank members of Visa and MasterCard.

11.     The Acquiring Banks are members of the Visa and MasterCard networks and are participants in the conspiracy to set, fix and enforce Interchange Fees and impose restrictive and anticompetitive rules on merchants, including Plaintiffs.  The Acquiring Banks have conspired with each other, with Issuing Banks, and with the Visa and MasterCard networks to set Interchange Fees at supracompetitive levels and then impose restrictive rules upon the merchants which prevent the merchants from using the price mechanism and horizontal price competition to drive Interchange Fees down to the competitive level that would exist in the absence of the anticompetitive rules.  The Visa and MasterCard Boards of Directors have directly set the respective level of Visa and MasterCard's Interchange Fees and, in conspiracy with their respective members, have directly adopted and enforced the restrictive rules.  The Acquiring and Issuing Banks have had actual knowledge of and have knowingly participated in the conspiracy to collectively set Interchange Fees and then enforce those Interchange Fees by imposing restrictive rules upon the merchants.

## V.     JURISDICTION

12.     Counts I and II of this complaint are civil antitrust claims arising under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).  Counts I and II also assert contingent claims under Section 1 of the Sherman Act and Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief.  The claims for injunctive relief are contingent on and are asserted against the defendants only in the event that the settlement of the claim for injunctive relief set forth in the Rule 23(b)(2) Class Action Settlement which has been entered into between the Rule 23(b)(2) settlement class and the defendants in the Interchange Fee

MDL, is substantially modified and/or not finally approved by the District Court and any subsequent appellate court review.  This Court has subject-matter jurisdiction over Counts I and II pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.     Counts III through VI of this complaint are civil antitrust claims arising under Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 4 of the Clayton Act (15 U.S.C. §15(a)).  Counts III through VI also assert contingent claims under § 2 of the Sherman Act and §16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief.  These claims for injunctive relief are contingent on and are asserted against the defendants only in the event that the settlement of the claims for injunctive relief set forth in the Rule 23(b)(2) Class Action Settlement which has been entered into between the Rule 23(b)(2) settlement class and the defendants in the Interchange Fee MDL, is substantially modified and/or not finally approved by the District Court and any subsequent appellate court review.  This Court has subject-matter jurisdiction over Counts III through VI pursuant to 28 U.S.C. §§ 1331 and 1337(a).

14.     This Court has original jurisdiction over Plaintiffs' state antitrust and unfair competition claims under 28 U.S.C. § 1332 in that the amount in controversy in this matter exceeds $75,000 and involves citizens of different states.  The Court also possesses supplemental jurisdiction over Plaintiffs' state antitrust and unfair competition claims pursuant to 28 U.S.C § 1367.

15.     The allegations in this complaint should be read in the alternative, if necessary, to avoid inconsistency.

## VI.     VENUE

16.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 in that each defendant is an inhabitant of this District or is found or transacts business in this District.

## VII.  DEFINITIONS

17.  The terms below have the following meanings as used in this complaint:

(A)  "General Purpose Credit Cards" are payment cards that enable the holder to purchase goods or services from a seller that are to be paid for by the issuer of that card on behalf of the cardholder, repayment of which is set by agreement between the issuer and the holder.  The terms of that agreement generally result in different classes of cards which are known and defined as follows:

(1)  A "Credit Card" is a payment card not specific to any particular merchant that enables the cardholder to obtain goods, services or cash on credit issued by the issuing bank which is a member of a card network such as Visa or MasterCard.

(2)  "Premium Credit Cards" are Credit Cards that offer rewards or other benefits to the cardholder and impose higher Interchange Fees on retail merchants than standard or non-Premium Cards.  In 2002, approximately 15% of Visa Credit Cards issued in the United States were Premium Credit Cards.  By 2010, in excess of 40% of the Visa and MasterCard branded payment cards in the United States were Premium Credit Cards.

(B)  An "Issuing Bank" is a member of a payment card association or network, such as Visa or MasterCard, and issues payment cards to consumers for use as a payment device.  Subject to the anticompetitive restrictions and practices alleged below, Issuing Banks are horizontal competitors and compete with one another to issue Credit Cards to consumers and to encourage the use of their cards by consumers.

(C)  An "Acquiring Bank" is a member of a credit card association or network, such as Visa or MasterCard, and acquires payment transactions from merchants and enforces card network rules, regulations, restraints and fee structures.  Subject to the anticompetitive restrictions and practices alleged below, Acquiring Banks are horizontal competitors and

8

compete against each other and against other processors to acquire the transaction business of retail merchants.

(D)     "Network Services" are the collection of services that Visa and MasterCard provide to retail merchants that accept their payment cards and to consumers who utilize their cards.  These Network Services include authorization, clearance and settlement of retail transactions by the Acquiring Bank from the Issuing Bank using the Visa or MasterCard networks.  Visa and MasterCard are horizontal competitors and compete against each other to provide network services to retail merchants and cardholders.  The anticompetitive and restrictive rules and practices alleged herein substantially and unreasonably restrain the competition between MasterCard and Visa and in particular eliminate virtually all horizontal price competition between MasterCard and Visa for the use of their respective Credit Cards at the point of sale or interaction.

(E)     "Interchange Fee" is the fee that retail merchants pay to the Issuing Bank in connection with each retail transaction in which the Issuing Bank's card is used as the method of payment.  Pursuant to the agreements by and among (i) Visa and its member banks and (ii) MasterCard and its member banks, Interchange Fees are set by the rules of each network and enforced by the member banks through required terms that are included in their contracts with retail merchants.  In the absence of a bilateral agreement between a merchant and an Issuing Bank, the rules of both networks, to which merchants are required to adhere, provide that all card transactions will occur at the default Interchange Fee rate set by the network.  Because the Issuing Bank will receive at least the default rate if it does not bilaterally negotiate a lower Interchange Fee rate with a merchant, there is no benefit or reason for the Issuing Bank to agree to a lower rate.  Issuing Banks would negotiate lower rates if the merchants could use the price

9

mechanism (*i.e.*, discounts and surcharges) or steering methods to effectively steer consumers to use lower cost cards.  Under those circumstances, Issuing Banks would lose transactional volume if they kept their prices (*i.e.*, Interchange Fees) too high, which would result in the Issuing Bank becoming the target of merchant steering.  In order to avoid a loss of volume or gain of volume at the expense of other competing Issuing Banks, the Issuing Banks would lower their Interchange Fees.  The anti-steering merchant restraint rules of both MasterCard and Visa, however, preclude merchants from effectively steering consumers to lower cost payment cards. As a result, the default Interchange Fee is in practice a fixed price, which is significantly greater than the competitive price would be.

(F)     The "No Surcharge" rule is a rule that was adopted by both the Visa association and the MasterCard association long before January 1, 2004.  The Visa "No Surcharge" rule forbids retail merchants from imposing a surcharge on any Visa payment card transaction so as to either reflect the cost differences among various payment methods or to incentivize (or steer) consumers to use less expensive payment forms.  Similarly, the MasterCard "No Surcharge" rule forbids retail merchants from imposing a surcharge on any MasterCard payment card and thereby prevents the merchant from using price to either reflect the cost differences among various payment methods or to incentivize (or steer) consumers to use less expensive payment forms.  For example, each network prohibits retail merchants from surcharging cardholders who use their higher-priced Premium Card rather than their lower-priced standard card.  If merchants could surcharge the higher-priced Premium Cards, consumers would switch to the lower-cost standard cards.  If the network or Issuing Banks did not want to lose transactional volume they would have to lower their Interchange Fees on Premium Cards to competitive levels.  Similarly, if merchants could surcharge MasterCard cards and/or Visa cards,

10

the merchant could use price to incentivize the consumer to switch to whichever network gave the merchant lower prices.  In order to avoid a loss of transactional volume, each network would have to lower its price to the competitive level so as to avoid being targeted and surcharged by merchants.  Among other effects, the "No Surcharge" rule eliminates any incentive for either Visa or MasterCard or any other competing card network or any Issuing Bank to charge a lower Interchange Fee because such lower Interchange Fees will not be visible to consumers and will not lead to increased usage by consumers or increased transactional volume for the network or for the Issuing Bank that lowered its rate.  The "No Surcharge" rule also gives Visa and MasterCard an incentive to encourage consumers to use the most expensive (to the merchant) payment card rather than the most cost-efficient card or payment method.  It is contrary to the independent economic self-interest of each Visa Bank Member to prevent merchants from surcharging the payment cards of other Visa Bank Members.  It is similarly contrary to the independent economic self-interest of each MasterCard Bank Member to prevent merchants from surcharging the payment cards issued by other MasterCard Bank Members.

(G)     The "No Discount" rule is the mirror image of the "No Surcharge" rule and was adopted by the Visa association and the MasterCard association long before January 1, 2004.  The Visa "No Discount" rule forbids merchants from (1) granting to any consumer a discount to use a Visa payment card issued by any particular Visa Issuing Bank but not offered to consumers who use a Visa payment card issued by any other Visa Issuing Bank, and (2) issuing a discount to any consumer to use a non-Visa payment card.  Under this rule, the merchant cannot charge a lower price to incentivize or steer the consumer to use a Visa payment card issued by a bank that charges the merchant a lower fee to accept its cards, nor can the merchant charge a lower price to a consumer if the consumer uses the card of a competing card

network such as MasterCard or Discover.  The MasterCard "No Discount" rule works in the same way, except that it prevents a merchant from charging a lower price for the use of a non-MasterCard payment card or a lower price for the use of a particular Issuing Bank's MasterCard. The "No Discount" and "No Surcharge" rules of Visa prevent a merchant from charging more to a consumer who uses a Visa Card (even if Visa is more costly for the merchant to accept) or less to a consumer who uses a competing network's payment card (even if that competing network's card is less expensive for the merchant to accept).  The MasterCard "No Discount" and "No Surcharge" rules operate exactly the same way and similarly preclude all price competition either between competing card networks or between competing Issuing Banks of the same branded card at the point of sale for consumer use of payment cards.  It is contrary to the independent economic self-interest for a bank member of Visa that is also a member of MasterCard to prohibit a merchant from offering a discount to a consumer to use that bank's MasterCard or to prohibit a merchant from offering a discount to consumers to use its card when the merchant does not also offer discounts to customers using a Visa card issued by a competing Issuing Bank.

(H)     The "Honor-All-Cards" rule is a rule that has been adopted by both card networks.  It requires a retail merchant to accept all of Visa's products or all of MasterCard's products (regardless of category or issuer) if the retail merchant accepts any Visa product or any MasterCard product respectively.  This rule is enforced in two ways.  With respect to products in the same category (*e.g.*, standard cards and Premium Cards or cards issued by different member banks), adherence to the rule is an express condition of participating in the Visa network and the MasterCard network.  With respect to products in different categories (*e.g.*, credit and debit cards), the rule is enforced by each respective network by withholding favorable pricing from those merchants who decline one of the products, *i.e.*, economic coercion.  If merchants were not

12

required to accept all Visa cards or all MasterCard cards, the merchant could refuse to accept high-cost cards such as Premium or commercial cards or refuse to accept cards issued by specific Issuing Banks.  This would incentivize the networks to lower the price of the high-cost cards or face a pro-competitive loss of transactional volume as consumers would switch to lower-cost accepted cards.  It would also incentivize an Issuing Bank to lower its Interchange Fees so as to avoid having its cards, or some of them, rejected by the merchants.

(I)     The "All-Outlets" rule is a rule that has been adopted by both networks that requires a retail merchant with multiple outlets to accept either Visa or MasterCard payment cards at all of its outlets, even if some of those outlets are owned by a separate corporate entity, operated under a different brand name or employ a different business model.  If the "All-Outlets" rule were abolished, thrift or low-cost retailers which are owned by corporate entities that also own standard-price retailers would be able to refuse to accept a defendant's or Issuing Bank's payment cards unless the defendant or Issuing Bank lowered its price.  In this way, discount or thrift retailers could drive down their Interchange Fees.

(J)     The "No-Bypass" rule is a rule that has been adopted by both networks that respectively prohibits retail merchants and member banks from by-passing the Visa or the MasterCard system for clearing, authorizing or settling card transactions even if the Issuing and Acquiring Bank are the same.  If a merchant could bypass the Visa or MasterCard system for the electronic clearing, authorizing or settling card transactions, the various electronic systems capable of performing those services could compete for the business and the fees paid by the merchants, including the Plaintiffs, for these electronic network services would decline to the competitive level.  Due to the "No-Bypass" rule, merchants pay supracompetitive fees to the electronic networks for these services.

13

(K)     The "No-Multi-Issuer" rule is a rule of both networks that prohibits a bank that processes any other card network transaction from also processing other card networks' transactions.  Visa and MasterCard grant each other an exception to this rule.  The "No Multi-Issuer" rule prohibits any bank member of MasterCard and any bank member of Visa from issuing a payment card that contains the electronic information for one or more additional card issuers.  Thus, one card issuer cannot issue a card that would allow the retail customers to route the transaction to whichever of the multiple issuers would charge the merchant the lowest fee for the transaction.  In the absence of the "No-Multi-Issuer" rule, consumers would demand and issuers would issue cards with multiple issuers' electronic data on the card and the multiple issuers would compete on price to be favored by the merchant so that the merchant would incentivize and steer the consumer to use that issuer's services.

(L)     The "No-Surcharge" rule, the "No-Discount" rule, the "Honor-All-Cards" rule, the "All-Outlets" rule, the "No-Bypass" rule and the "No-Multi-Issuer" rule are referred to collectively below as the "Merchant Restraints."

## VIII.   TRADE AND COMMERCE

18.     Defendants are engaged in interstate commerce and the unlawful activities alleged below have occurred in, and substantially affected, interstate commerce.

## IX.     INJURY TO CONSUMER WELFARE AND COMPETITION

19.     The conspiracies between MasterCard and its member banks and between Visa and its member banks alleged herein (1) set Interchange Fees at supracompetitive rates and (2) protect and preserve those unduly high fees by imposing the anti-steering Merchant Restraints on the Plaintiffs and all other merchants.  If merchants could steer consumers to lower cost payment products by granting discounts for the use of a lower cost payment product or imposing surcharges on higher cost payment products, they could use the price mechanism to direct

14

consumers to less costly payment forms.  The higher cost payment forms, such as MasterCard and Visa Credit Cards and especially their Premium Credit Cards, would lose consumer usage as consumers would switch to the lower cost discounted cards or away from the higher cost surcharged cards.  In order to avoid a loss of transactional volume to less expensive payment cards, MasterCard and/or Visa would have to lower their anticompetitively high prices or face a pro-competitive loss of transactional volume as consumers switched to lower cost payment cards in order to obtain a discount or avoid a surcharge.  Presented with the opportunity to increase their volume of transactions, payment card providers such as the Discover Card would offer lower prices to merchants, who would discount the Discover Card or surcharge the MasterCard and/or Visa payment cards.  In the alternative, in the absence of the Merchant Restraints, such as the "Honor-All-Cards" rule, a merchant could simply refuse to accept the MasterCard and/or Visa high-cost Premium Cards.  Again, MasterCard and/or Visa would have to lower their Premium Card rates or face a loss of transactional volume due to their unduly high prices.  Indeed, merchants would not even be required to actually discount low-cost cards, surcharge high-cost cards, or refuse to accept high-cost Premium Cards in order to use the price mechanism to put competitive pressure on MasterCard and/or Visa and successfully drive MasterCard and/or Visa's supracompetitive prices down.  In the absence of the Merchant Restraints, the merchants could credibly threaten to discount low-cost payment cards or surcharge high-cost payment cards or refuse to accept specific cards and MasterCard and Visa and the Issuing Banks would respond by lowering their prices to competitive levels rather than facing the loss of transactional volume that they would suffer if the threat to differentially price or refuse to accept their payment cards was carried out.

20.     Due to the anticompetitive Merchant Restraints, both MasterCard and Visa have been able to dramatically and with impunity raise the Interchange Fees that Plaintiffs and other merchants pay.  Specifically, merchants pay far higher Interchange Fees to accept Premium Cards than they do for non-Premium Cards.  As a result, when MasterCard, Visa and their respective Issuing Bank members reclassify standard Credit Cards as Premium Cards or simply issue more Premium Cards and fewer standard cards, the Interchange Fees paid by the merchants go up significantly.  If the merchants could push back against these price increases by, for example, surcharging the Premium Cards or discounting the standard cards, the defendants would face a loss of transactional volume on their Premium Cards – which is exactly what is supposed to occur in a competitive market where the price mechanism is allowed to function. Due to the Merchant Restraints, however, the merchants cannot raise the price of Premium Cards (*i.e.*, a surcharge) or lower the price of non-Premium Cards (*i.e.*, a discount) and all cross-elasticity of demand at the point of sale between the high-cost cards and the lower-cost cards is destroyed.  The destruction of that cross-elasticity of demand allows MasterCard, Visa and their respective co-conspirators to exercise substantial market or monopoly power – meaning the power to raise price without losing so much sales as to render the price increase unprofitable. Indeed, the Merchant Restraints in this case are so effective at destroying cross-elasticity of demand and horizontal price competition at the point of sale that MasterCard and Visa are able to substantially increase price by, for example, issuing more Premium Cards without losing any transactional volume at all.

21.     Each conspiracy alleged herein has had an anticompetitive impact on the market and injures economic efficiency and consumer welfare in at least the following ways:

(A)     Supracompetitive Interchange Fees can lead to higher retail prices.  Higher

16

retail prices lead to a reduction in output and economic welfare.  The higher retail prices paid by all consumers also result in cash customers, low-income customers who do not use Credit Cards and other customers who use lower-cost payment methods subsidizing MasterCard and Visa Premium Card users who receive free reward points that, in effect, are paid for by the higher retail prices that merchants must charge all consumers;

(B)     Supracompetitive Interchange Fees create incentives for Issuing Banks to encourage the use of high-cost payment cards rather than low-cost payment cards and thereby encourage inefficiency and misallocation of resources; and

(C)     Supracompetitive Interchange Fees distort competition between different Credit Cards in favor of products with the higher Interchange Fees and dissuade either new entrants or existing competitors from trying to increase their transactional volume by offering lower prices because the Merchant Restraints preclude offers of lower prices to the merchant from being translated into a lower price to the consumer, which would then result in higher usage of the lower-cost Credit Card by consumers.  In other words, the Merchant Restraints accomplish their specifically intended anticompetitive purpose, which is to eliminate horizontal price competition among Credit Cards and the payment card networks for consumer utilization of their payment products at the point of sale.

22.     The collective setting of Interchange Fees and the imposition of the Merchant Restraints by Visa and its member banks and by MasterCard and its member banks also restricts competition among the member banks of each respective network for the provision of card Network Services to merchants.  Absent the conspiracies alleged herein, the Issuing Bank members of both networks could and would negotiate individually with retail merchants and merchants would be free to accept or reject the cards issued by particular Issuing Banks or to

surcharge their customers for using Credit Cards issued by a particular bank.  Thus, the merchant

could foment horizontal price competition in Interchange Fees between the various Issuing Bank

members of Visa and also foment horizontal price competition among the Issuing Bank members

of MasterCard.  Under these circumstances, prices and output would be responsive to the cost of

providing credit card services and consumer preference rather than being set at monopolistic

levels by the two bank/network cartels and then defended by the Merchant Restraints against

competitive encroachment from the normal functioning of supply and demand and the price

mechanism.

## X.    RELEVANT MARKET

23.    The relevant geographic market in this case is the United States.

24.    There are at least three relevant product markets in which the restraints and other

conduct alleged in this complaint have had an anticompetitive effect.  Those relevant product

markets are:

> (A)    Network Services for General Purpose Credit Cards.  *See United States v.*
> *Visa and MasterCard*, 344 F.3d 229, 239 (2d Cir. 2003).
>
> (B)    Network Services for Visa Credit Cards.
>
> (C)    Network Services for MasterCard Credit Cards.
>
> (D)    The term "relevant market," as used in this complaint, refers to the
> relevant product market alleged in Paragraphs 24(A) and, in the alternative
> thereto, to the relevant product markets alleged in paragraphs 24(B) and
> (C) unless one or the other product markets is specifically alleged below.

25.    The Court has already found in this litigation that at least defendant MasterCard

possesses monopoly power in the market for Network Services for General Purpose Credit

Cards, and also, that there is a market for Network Services for MasterCard Credit Cards.  *See In*

18

*re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392 (E.D.N.Y. 2008).

26.     In the relevant market, the sellers are payment card networks and their member banks, and the buyers are retail merchants.  The Interchange Fee is the price directly paid by retail merchants to receive payment for a transaction consummated with a General Purpose Credit Card.  Retail merchants, as a group, directly pay billions of dollars a year to purchase Network Services sold by sellers in the relevant market and this amount is increasing rapidly from year to year.

27.     A seller with market power over Network Services associated with General Purpose Credit Cards in the United States can raise Interchange Fees to retail merchants substantially above the competitive level without losing sufficient business to make the price increase unprofitable.  Retail merchants cannot substitute other payment methods (such as cash, checks) for General Purpose Credit Cards because of the high degree of preference for General Purpose Credit Cards among their customers.  As a result, other payment methods, such as cash or checks, are not close substitutes for General Purpose Credit Cards in the eyes of merchants and merchants will not stop taking General Purpose Credit Cards and switch to only alternative payment forms if they experience a non-transitory price increase in Interchange Fees.

28.     At all relevant times, Visa and MasterCard have each had substantial market power in the relevant market as demonstrated by: (1) their ability to raise Interchange Fees without losing business to other sellers or other payment methods; (2) their ability to price discriminate among different classes of merchants; and (3) their ability to shift Credit Card usage from standard cards to Premium Cards, which have even higher and faster growing Interchange Fees, without losing any transactional volume.

29.     There are significant barriers to entry in the relevant market.  No company has successfully entered the market since 1985.  Entry is estimated to cost over $1 billion to overcome the alleged "chicken-and-egg" problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place.

## XI.   FACTUAL ALLEGATIONS

30.     Prior to the IPO on March 19, 2008, Visa was a national bank-card association whose members included banks, regional banking associations and other financial institutions.  Visa was established by its members to develop, promote and operate a national bank Credit Card network.

31.     Visa's predecessor, Bank Americard, was the local credit card program of Bank of America, based in California.  In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI").  In 1977, NBI changed its name to Visa.

32.     Prior to the IPO on May 25, 2006, MasterCard was a national bank-card association whose members included banks, regional banking associations and other financial institutions.  MasterCard was established by its members to develop, promote and operate a national bank Credit Card network.

33.     MasterCard's predecessor, the Interbank Card Association, was a credit card program established in 1966.  In 1969, the program was purchased by the California Bank Association and its name was changed to "Master Charge."  In 1979, the association was renamed MasterCard.

34.     During Visa and MasterCard's early years, merchants that accepted General-Purpose Credit Cards made paper records of transactions, which were then processed by the

20

merchant's Acquiring Bank and the cardholder's Issuing Bank.

35.     Since the simple and somewhat crude beginnings, the Visa and MasterCard systems have evolved into mature systems that place anticompetitive restrictions on the technologically efficient payment card market.

36.     The General Purpose Credit Card market today is a saturated, mature market characterized by high levels of concentration for both Issuing and Acquiring Banks.  The top seven issuers issue more than 90% of all Credit Cards and the top eight Acquiring Banks acquire and process more than 90% of all payment card transactions.  The General Purpose Credit Card market is also characterized by a low and decreasing cost structure.  In a competitive market, decreasing costs of production result in lower and decreasing prices.  Due to the anticompetitive practices alleged herein, however, the prices merchants pay for MasterCard and Visa payment card services are, and for many years have been, increasing at a rapid rate despite the sharply decreasing costs that MasterCard and Visa and their member banks have experienced and continue to experience.

37.     Visa and MasterCard, in concert respectively with their member banks, set and determine the Interchange Fees paid by merchants.  Issuing Banks do not, and have not, independently negotiated Interchange Fees with merchants in a systematic way or to a competitively significant extent.  As a result of the Merchant Restraints, retail merchants have no practical ability to negotiate a lower Interchange Fee because they are required to accept a Visa or MasterCard issued by the bank in question as long as they accept any Visa or MasterCard card issued by other banks and are prohibited from using normal economic incentives to reduce the price they pay by either surcharging high-cost cards or discounting low-cost cards.  Thus, a merchant's only option, in the face of an increase in Interchange Fees by either Visa or

MasterCard, is to decline Visa or MasterCard products entirely, an option that is not economically feasible or realistically available.

38.     The Visa member banks and the MasterCard member banks, in concert respectively with Visa and MasterCard, have devised, adopted and agreed to enforce the Merchant Restraints, which have the purpose and effect of preventing merchants like Plaintiffs from resisting increases in Interchange Fees by either rejecting high-cost cards or by influencing customers to use the less expensive payment cards.  The Merchant Restraints have the effect of severing the connection that exists in a properly functioning market between higher prices (*i.e.*, Interchange Fees) and lower consumer demand for the product or service in question (*i.e.*, Visa or MasterCard Credit Card usage).

39.     Interchange Fees were devised in the early days of the Visa and MasterCard networks for the purpose of paying for the costs of transferring transactional paper between the Acquiring Banks and the Issuing Banks and, purportedly, to balance network costs between issuers and acquirers.

40.     The justification offered in the early 1980s for Interchange Fees was that the fees were to induce banks to issue cards to cardholders and to "acquire" merchants for the association.  With the maturation of the market as alleged above, those purported justifications ceased to have any economic relevance or validity at least as early as 1990.

41.     Today, in contrast to the early 1980s, Visa and MasterCard have each established market power as a matter of adjudicated fact and appellate affirmation.  *See United States v. Visa*, 344 F.3d 229, 239 (2d Cir. 2003).  As the Second Circuit noted, even in the face of frequent and significant increases in Interchange Fees, merchants have no choice but to continue to accept Visa and MasterCard credit cards.

22

42.      In view of the present-day penetration of Visa and MasterCard Credit Cards, banks now would find it in their interest to issue Visa and/or MasterCard Credit Cards and acquire merchant transactions, even without the promise of collusively set Interchange Fees that are defended and protected by the Merchant Restraints.  Visa, MasterCard and their respective co-conspirator member banks' unlawful conduct has prevented Interchange Fees from being determined by the free interaction of the laws of supply and demand and the operation of the normal price mechanism where consumers know the price and decide whether to pay it or to switch to a lower-cost close substitute service or product.

43.      The Visa and MasterCard networks could function efficiently without collectively determined and defended Interchange Fees and/or the Merchant Restraints.  Even if Visa, MasterCard and their respective member banks did not collectively set Interchange Fees, Defendants could each continue to operate as a clearinghouse between Issuing and Acquiring Banks.  In other words, collectively determined Interchange Fees and rules designed to prevent merchants from using price to steer consumers to lower-cost payment products so as to resist increasing Interchange Fees are not functionally necessary to the existence and operation of the Visa network or the MasterCard network.  Similar payment card networks in other countries function very efficiently without the Merchant Restraints or collectively set and defended Interchange Fees, and the fees they charge are a mere fraction of those charged by the defendants in the United States.

44.      The collective setting and defending through the use of the Merchant Restraints of the Interchange Fees is not reasonably necessary to the operation of either the Visa network or the MasterCard network.  Market forces, rather than collective action, should determine the level of Interchange Fees.

45.     In their quest to extract ever higher revenue from retail merchants like the Plaintiffs through the exercise of their market power, Visa and its co-conspirator member banks and MasterCard and its co-conspirator member banks have each instituted a number of pricing tiers for different classes of retail merchants and have set Interchange Fee levels for standard and Premium Cards using those pricing tiers.  Visa and its co-conspirator member banks and MasterCard and its co-conspirator member banks each enforce and defend these pricing tiers and excessive Interchange Fees through their operating rules (*i.e.*, the Merchant Restraints), which insulate the pricing tiers and Interchange Fees from competitive and normal market forces and, in particular, from the operation of the price mechanism at the point of sale.

46.     Prior to its IPO in May 2006, MasterCard and its co-conspirator member banks collectively and in combination with each other agreed to impose the Merchant Restraints on all merchants, enforce those restraints against the merchants, and require each merchant to agree in writing to adhere to the Merchant Restraints.  Prior to May 2006, MasterCard and its co-conspirator member banks also collectively and in combination with each other agreed to and determined the Interchange Fees that would be paid by the merchants.

47.     Subsequent to May 2006, MasterCard and its member banks undertook no acts that were inconsistent with the purposes and goals of their prior collective action and undertook no conduct that would tend to defeat those purposes and goals or the effects of their prior conduct.  To the contrary, subsequent to May 2006, MasterCard continued to promulgate and enforce the Merchant Restraints and each member bank agreed in writing, and knew that every other member bank agreed in writing, to continue to adhere to and impose the Merchant Restraints on every merchant.  Subsequent to May 2006, each member bank and MasterCard knowingly and intentionally continued to receive the anticompetitive benefits, including

excessively high Interchange Fees, of their prior conduct and continued to commit acts, including the setting and enforcement of excessively high Interchange Fees that promote the purpose and effect of their conspiracy.

48.     Subsequent to May 2006, MasterCard's member banks, through MasterCard, collectively agreed that MasterCard would continue to set the Interchange Fee rates and that the member banks would continue to enforce and defend those rates by imposing the Merchant Restraints on the Plaintiffs and other merchants.  It would be contrary to the independent self-interest of each of MasterCard's bank members to prevent merchants from discounting Credit Cards which it issues, surcharging Credit Cards issued by its competitors, or refusing to accept its competitors' Credit Cards.  However, if each member bank knew and understood and tacitly agreed that the other member banks would reciprocate by preventing merchants from surcharging that member's Credit Cards, refusing to accept that member's Credit Cards or discounting their own Credit Card, then it would be in the collective economic interest of all the MasterCard member banks to have MasterCard set the Interchange Fees at excessively high supracompetitive levels and to then defend those rates against the forces of competition by agreeing to and actually imposing the Merchant Restraints on every merchant who accepted MasterCards.  Subsequent to May 2006, MasterCard and each of its member banks consciously ascribed to and knowingly participated in a common scheme and understanding that MasterCard Interchange Fees would be set at supracompetitive levels and that those excessive price levels would be enforced and defended by the member banks through the continued promulgation and enforcement of the Merchant Restraints.

49.     Prior to its IPO on March 19, 2008, Visa and its co-conspirator member banks collectively and in combination with each other agreed to impose the Merchant Restraints on all

merchants, enforce those restraints against the merchants, and require each merchant to agree in writing to adhere to the Merchant Restraints.  Prior to that date, Visa and its co-conspirator member banks also collectively and in combination with each other agreed to and determined the Interchange Fees that would be paid by the merchants.

50.     Subsequent to March 19, 2008, Visa and its member banks undertook no acts that were inconsistent with the purposes and goals of their prior collective action and undertook no conduct that would tend to defeat those purposes and goals or the effects of their prior conduct. To the contrary, subsequent to March 19, 2008, Visa continued to promulgate and enforce the Merchant Restraints and each member bank agreed in writing, and knew that every other member bank agreed in writing, to continue to adhere to and impose the Merchant Restraints on every merchant.  Subsequent to March 19, 2008, each member bank and Visa knowingly and intentionally continued to receive the anticompetitive benefits, including excessively high Interchange Fees, of their prior conduct and continued to commit acts, including the setting and enforcement of excessively high Interchange Fees that promote the purpose and effect of their conspiracy.

51.     Subsequent to March 19, 2008, Visa's member banks, through Visa, collectively agreed that Visa would continue to set the Interchange Fee rates and that the member banks would continue to enforce and defend those rates by imposing the Merchant Restraints on the Plaintiffs and other merchants.  It would be contrary to the independent self-interest of each of Visa's bank members to prevent merchants from discounting Credit Cards which it issues, surcharging Credit Cards issued by its competitors, or refusing to accept its competitors' Credit Cards.  However, if each member bank knew and understood and tacitly agreed that the other member banks would reciprocate by preventing merchants from surcharging that member's

26

Credit Cards, refusing to accept that member's Credit Cards or discounting their own Credit Card, then it would be in the collective economic interest of all the Visa member banks to have Visa set the Interchange Fees at excessively high supracompetitive levels and to then defend those rates against the forces of competition by agreeing to and actually imposing the Merchant Restraints on every merchant who accepted Visa.  Subsequent to March 19, 2008, Visa and each of its member banks consciously ascribed to and knowingly participated in a common scheme and understanding that Visa Interchange Fees would be set at supracompetitive levels and that those excessive price levels would be enforced and defended by the member banks through the continued promulgation and enforcement of the Merchant Restraints.

52.     These restraints on competition alleged herein are not reasonably related or necessary to the operation of either Visa or MasterCard and, in any event, are more restrictive than necessary to effectuate any legitimate business goal of either Visa or MasterCard.

## COUNT I
## CONSPIRACY IN RESTRAINT OF COMPETITION AGAINST VISA
### (RE: INTERCHANGE FEES)

53.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 above.

54.     As alleged more fully above, the setting of Interchange Fees and the collective enforcement and preservation of those Interchange Fees through the use of the Merchant Restraints by Visa and its co-conspirator member banks unreasonably injures competition and eliminates horizontal price competition with respect to Interchange Fees paid by the Plaintiffs and other merchants and violates Section 1 of the Sherman Act.

55.     Visa and its co-conspirator member banks have entered into and engaged in a continuing combination and conspiracy to fix, raise or maintain the Interchange Fees charged to Plaintiffs and others at an artificially high level that could not be maintained in the absence of

27

their illegal conduct.

56.     The combination and conspiracy among Visa and its co-conspirators described in the preceding paragraphs consists of a continuing course, practice and pattern of conduct regarding the setting of Interchange Fees charged to Plaintiffs and others.

57.     The substantial terms and purpose of this agreement were to refrain from competing against each other on the setting of Interchange Fees charged to Plaintiffs and others and to then enforce and preserve those Interchange Fees by preventing the merchant from using the price mechanism or other competitive steering devices to drive the Interchange Fees to competitive levels.

58.     In order to effect the foregoing illegal combination and conspiracy, Visa and its co-conspirators have engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and exchanging current and future price information about Interchange Fees; (2) agreeing to coordinate, and coordinating, the Interchange Fees they charge to Plaintiffs and others; and (3) agreeing to impose and then enforce the Merchant Restraints on all merchants.

59.     As part of its unlawful conduct Visa and each of its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful conspiracy alleged in this Count I.

60.     As a result of Visa's and its co-conspirators' violation of Section 1 of the Sherman Act, and during all times relevant to the allegations in this complaint, Interchange Fees have been set and maintained at artificially high and noncompetitive levels in the United States and Plaintiffs and other retail merchants have been deprived of the benefit of free market forces in the setting of Interchange Fees.

61.     Plaintiffs have been injured in their business or property by reason of the conspiracy alleged herein and entered into by Visa and its co-conspirator member banks in an amount not yet determined.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes Visa's conduct unlawful.

62.     Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, Visa's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

63.     The setting of the Interchange Fees by Visa and its member banks, in conjunction with the group promulgation and enforcement of the Merchant Restraints, constitutes a contract, combination or conspiracy in unreasonable restraint of competition.

64.     Visa's conspiracy has had a substantially adverse effect on competition in the relevant market and has resulted in higher prices than would exist in the absence of the conspiracy.  There are no procompetitive justifications for Visa's restraints and, even if there were (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported procompetitive justifications.

65.     Visa and its co-conspirators have knowingly participated in and taken affirmative steps in furtherance of the conspiracy alleged herein.

66.     As a direct and proximate result of the horizontal conspiracy between Visa and its member banks, Interchange Fees have been set at artificially high, supracompetitive levels and Plaintiffs have suffered injuries to their business and property by paying such artificially inflated fees.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes Visa's conduct unlawful.

**COUNT II**
**CONSPIRACY IN RESTRAINT OF COMPETITION AGAINST MASTERCARD**
**(RE: INTERCHANGE FEES)**

67.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 52 above.

68.     As alleged more fully above, the setting of Interchange Fees and the collective enforcement and preservation of those Interchange Fees through the use of the Merchant Restraints by MasterCard and its co-conspirator member banks unreasonably injures competition and eliminates horizontal price competition with respect to Interchange Fees paid by the Plaintiffs and other merchants and violates Section 1 of the Sherman Act.

69.     MasterCard and its co-conspirator member banks have entered into and engaged in a continuing combination and conspiracy to fix, raise or maintain the Interchange Fees charged to Plaintiffs and others at an artificially high level that could not be maintained in the absence of their illegal conduct.

70.     The combination and conspiracy among MasterCard and its co-conspirators described in the preceding paragraphs consists of a continuing course, practice and pattern of conduct regarding the setting of Interchange Fees to Plaintiffs and others.

71.     The substantial terms and purpose of this agreement were to refrain from competing against each other on the setting of Interchange Fees charged to Plaintiffs and others and to then enforce and preserve those Interchange Fees by preventing the merchants from using the price mechanism or other competitive steering devices to drive the Interchange Fees to competitive levels.

72.     In order to effect the foregoing illegal combination and conspiracy, MasterCard and its co-conspirators engaged in a number of overt acts, including, without limitation: (1) agreeing to exchange and exchanging current and future price information about Interchange

30

Fees; (2) agreeing to coordinate and coordinating the Interchange Fees to be charged to Plaintiffs and others; and (3) agreeing to impose and then enforce the Merchant Restraints on all merchants.

73.     As part of its unlawful conduct MasterCard and each of its co-conspirator member banks knowingly, intentionally and actively participated as distinct business entities in the unlawful conspiracy alleged in this Count II.

74.     As a result of MasterCard's and its co-conspirators' violation of Section 1 of the Sherman Act, and during all times relevant to the allegations in this complaint, Interchange Fees have been set and maintained at artificially high and noncompetitive levels in the United States and Plaintiffs and other retail merchants have been deprived of the benefit of free market forces in the setting of Interchange Fees.

75.     Plaintiffs have been injured in their business or property by reason of the conspiracy alleged herein and entered into by MasterCard and its co-conspirator member banks in an amount not yet determined.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes MasterCard's conduct unlawful.

76.     Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, MasterCard's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

77.     The setting of Interchange Fees by MasterCard and its member banks, in conjunction with the group promulgation and enforcement of the Merchant Restraints, constitutes a contract, combination or conspiracy in unreasonable restraint of competition.

78.     MasterCard's conspiracy has had a substantially adverse effect on competition in the relevant market and has resulted in higher prices than would exist in the absence of the

conspiracy.  There are no procompetitive justifications for MasterCard's restraints and, even if there were, (i) they are outweighed by the anticompetitive effects of the conspiracy, and (ii) there are less restrictive means of achieving those purported procompetitive justifications.

79.     MasterCard and its co-conspirators have knowingly participated in and taken affirmative steps in furtherance of the conspiracy alleged herein.

80.     As a direct and proximate result of the horizontal conspiracy between MasterCard and its member banks, Interchange Fees have been set at artificially high, supracompetitive levels and Plaintiffs have suffered injuries to their business and property by paying such artificially inflated fees.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes MasterCard's conduct unlawful.

## COUNT III
## VISA'S MONOPOLIZATION

81.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 above.

82.     Visa has monopoly power in the relevant market.

83.     Visa has used its monopoly power to impose on Plaintiffs and other retail merchants, restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market.  These restraints and restrictions include, but are not limited to, the Merchant Restraints.  The restraints and restrictions imposed by Visa make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

84.     As a direct and proximate result of Visa's exclusionary and anticompetitive conduct, Interchange Fees have risen to and remain at artificial, supracompetitive levels.

Plaintiffs have suffered and will suffer injury to their business or property by having to pay such artificially inflated, supracompetitive Interchange Fees for Network Services.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes Visa's conduct unlawful.

85.     Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, Visa's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

**COUNT IV**
**MASTERCARD'S MONOPOLIZATION**

86.     Plaintiffs incorporate by reference each and every allegation contained in Paragraph 1 through 52 above.

87.     MasterCard has monopoly power in the relevant market.

88.     MasterCard has used its monopoly power to impose on Plaintiffs and other retail merchants, restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market.  These restraints and restrictions include, but are not limited to, the Merchant Restraints.  The restraints and restrictions imposed by MasterCard make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

89.     As a direct and proximate result of MasterCard's exclusionary conduct, Interchange Fees have risen to and remain at artificial, supracompetitive levels.  Plaintiffs have suffered and will suffer injury to their business or property by having to pay such artificially inflated, supracompetitive Interchange Fees for Network Services.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes

33

MasterCard's conduct unlawful.

90.     Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, MasterCard's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

## COUNT V
## ATTEMPTED MONOPOLIZATION BY VISA

91.     Plaintiffs incorporate by reference the allegations contained in Paragraph 1 through 52 above.

92.     Visa's anticompetitive conduct has created a dangerous probability that Visa will achieve monopoly power in the relevant market.

93.     Visa has a specific intent to achieve monopoly power in the relevant market.

94.     Visa has used its market power to impose on Plaintiffs and other retail merchants, restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market.  These restraints and restrictions include, but are not limited to, the Merchant Restraints.  The regulations and restrictions imposed by Visa make it difficult or impossible for other card networks and providers to enter the relevant market or increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

95.     As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business or property by having to pay such artificially inflated, supracompetitive Interchange Fees for Network Services.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

96.     Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, Visa's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

## COUNT VI
## ATTEMPTED MONOPOLIZATION BY MASTERCARD

97.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 above.

98.     MasterCard's anticompetitive conduct has created a dangerous probability that MasterCard will achieve monopoly power in the relevant market.

99.     MasterCard has a specific intent to achieve monopoly power in the relevant market.

100.     MasterCard has used its market power to impose on Plaintiffs and other retail merchants, restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market.  These restraints and restrictions include, but are not limited to, the Merchant Restraints.  The restraints and restrictions imposed by MasterCard make it difficult or impossible for other card networks and providers to enter the relevant market or increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

101.     As a direct and proximate result of MasterCard's exclusionary conduct, Interchange Fees have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business or property by having to pay such artificially inflated, supracompetitive Interchange Fees for Network Services.  Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes MasterCard's conduct unlawful.

102.    Contingent on the final approval or disapproval of the Class Action Settlement pending in the Interchange Fee MDL, MasterCard's anticompetitive conduct threatens Plaintiffs with continuing loss or damage.

**COUNT VII**
**VIOLATIONS OF STATE ANTITRUST AND**
**UNFAIR COMPETITION LAWS BY VISA**

103.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 above.

104.    Plaintiffs allege they are "direct purchasers" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  However, in the event the Court were to find otherwise, the following causes of action under state antitrust and unfair competition laws, which permit indirect purchaser actions, are asserted in the alternative.

105.    By reason of the foregoing, Visa has violated California Business and Professions Code § 16700, *et seq*.  The alleged illegal agreements, combinations and/or conspiracies entered into between Visa and its member banks were formulated and implemented from Visa's offices in California and a significant amount of the conspiratorial conduct among Visa and its member banks took place in California.  Further, Visa's development, promulgation and imposition of the Merchant Restraints, and its monopolistic practices alleged herein, were performed and conducted from its offices in California.  Thus, California has a strong interest in the application of its antitrust and unfair competition laws in this case.  Further, application of California's antitrust and unfair competition laws in this case is consistent with due process.

106.    By reason of the foregoing, Visa has also violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.*   The defendants' acts and/or practices are deceptive within the meaning of UCL § 17200.  The alleged illegal agreements, combinations and/or conspiracies entered into between Visa and its member banks

36

were formulated and implemented from Visa's offices in California and a significant amount of the conspiratorial conduct among Visa and its member banks took place in California. Further, Visa's development, promulgation and imposition of the Merchant Restraints, and its monopolistic practices alleged herein, were performed and conducted from its offices in California. Thus, California has a strong interest in the application of its antitrust and unfair competition laws in this case. Further, application of California's antitrust and unfair competition laws is consistent with due process.

107. In the event that the Court does not apply California antitrust and unfair competition law to Plaintiffs' claims, Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative. Plaintiffs accept payment cards in connection with payment for goods or services in each of the states below, have paid supracompetitive Interchange Fees in each of the states below, and defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below:

108. **Alabama**: By reason of the foregoing, Visa has violated Alabama Code § 8-10-1, *et seq*.

109. **Arizona:** By reason of the foregoing, Visa has violated Arizona Revised Statutes, §§ 44-1401, *et seq*.

110. **Arkansas:** By reason of the foregoing, Visa has violated Arkansas' laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq*.

111. **District of Columbia:** By reason of the foregoing, Visa has violated District of Columbia Code Annotated §§ 28-4501, *et seq*.

010237-21 655065 V1

112.    **Florida:** By reason of the foregoing, Visa has violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

113.    **Hawaii:** By reason of the foregoing, Visa has violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

114.    **Iowa:** By reason of the foregoing, Visa has violated Iowa Code §§ 553.1, *et seq.*

115.    **Kansas:** By reason of the foregoing, Visa has violated Kansas Statutes Annotated, §§ 50-101, *et seq.*

116.    **Maine:** By reason of the foregoing, Visa has violated the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

117.    **Michigan:** By reason of the foregoing, Visa has violated Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

118.    **Massachusetts:** By reason of the foregoing, Visa has violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.*

119.    **Minnesota:** By reason of the foregoing, Visa has violated Minnesota Annotated Statutes §§ 325D.49, *et seq.*

120.    **Mississippi:** By reason of the foregoing, Visa has violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

121.    **Missouri:** By reason of the foregoing, Visa has violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.

122.    **Nebraska:** By reason of the foregoing, Visa has violated Nebraska Revised Statutes Annotated §§ 59-801, *et seq.* and Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*

010237-21  655065 V1

123.    **Nevada:**  By reason of the foregoing, Visa has violated Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

124.    **New Hampshire:** By reason of the foregoing, Visa has violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*

125.    **New Mexico:** By reason of the foregoing, Visa has violated New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

126.    **New York:** By reason of the foregoing, Visa has violated New York's General Business Law, N.Y. Gen. Bus. Law § 340, *et seq.*

127.    **North Carolina:** By reason of the foregoing, Visa has violated North Carolina General Statutes §§ 75-1, *et seq.*

128.    **North Dakota:** By reason of the foregoing, Visa has violated North Dakota Century Code §§ 51-08.1-01, *et seq.*

129.    **Oregon:**  By reason of the foregoing, Visa has violated Oregon Revised Statutes §§ 646.705, *et seq.*

130.    **Rhode Island**:  By reason of the foregoing, Visa has violated Rhode Island Gen. Laws Ann. §§ 6-36-1, *et seq.*

131.    **South Dakota:**  By reason of the foregoing, Visa has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

132.    **Tennessee:** By reason of the foregoing, Visa has violated Tennessee Code Annotated §§ 47-25-101, *et seq.*

133.    **Utah:** By reason of the foregoing, Visa has violated Utah Code §§ 76-10-911, *et seq.*

134.    **Vermont:** By reason of the foregoing, Visa has violated Vermont's Consumer

Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.*

135.    **West Virginia:** By reason of the foregoing, Visa has violated West Virginia Code §§ 47-18-1, *et seq.*

136.    **Wisconsin**: By reason of the foregoing, Visa has violated Wisconsin Statutes §§ 133.01, *et seq.*

137.    As a direct and proximate result of defendant Visa's unlawful conduct, Plaintiffs have been injured in their businesses and property in that they paid supracompetitive Interchange Fees due to the unlawful conduct of defendant and their co-conspirators.

**COUNT VIII**
**VIOLATIONS OF STATE ANTITRUST AND**
**UNFAIR COMPETITION LAWS BY MASTERCARD**

138.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 52 above.

139.    Plaintiffs allege they are "direct purchasers" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  However, in the event the Court were to find otherwise, the following causes of action under state antitrust and unfair competition laws, which permit indirect purchaser actions, are asserted in the alternative.

140.    By reason of the foregoing, MasterCard has violated New York General Business Law § 340, *et seq.*  The alleged illegal agreements, combinations and/ conspiracies entered into between MasterCard and its member banks were formulated and implemented from MasterCard's offices in New York and a significant amount of the conspiratorial conduct among MasterCard and its member banks took place in New York.  Further, MasterCard's development, promulgation and imposition of the Merchant Restraints, and its monopolistic practices alleged herein, were performed and conducted from its offices in New York.  Thus, New York has a strong interest in the application of its antitrust and unfair competition laws in this case.  Further,

application of New York's antitrust and unfair competition laws in this case is consistent with due process.

141.     In the event that the Court does not apply New York antitrust and unfair competition law to Plaintiffs' claims, Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative.  Plaintiffs accept payment cards in connection with payment for goods or services in each of the states below, have paid supracompetitive Interchange Fees in each of the states below, and defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below:

142.     **Alabama**:  By reason of the foregoing, MasterCard has violated Alabama Code § 8-10-1, *et seq*.

143.     **Arizona:** By reason of the foregoing, MasterCard has violated Arizona Revised Statutes, §§ 44-1401, *et seq*.

144.     **Arkansas:**  By reason of the foregoing, MasterCard has violated Arkansas' laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq*.

145.     **California:** By reason of the foregoing, MasterCard has violated California laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of California Business and Professions Code § 16700, *et seq*. and California's Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.*

146.     **District of Columbia:** By reason of the foregoing, MasterCard has violated District of Columbia Code Annotated §§ 28-4501, *et seq*.

147.     **Florida:** By reason of the foregoing, MasterCard has violated the Florida

Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

148.   **Hawaii:** By reason of the foregoing, MasterCard has violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

149.   **Iowa:** By reason of the foregoing, MasterCard has violated Iowa Code §§ 553.1, *et seq*.

150.   **Kansas:** By reason of the foregoing, MasterCard has violated Kansas Statutes Annotated, §§ 50-101, *et seq*.

151.   **Maine:** By reason of the foregoing, MasterCard has violated the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq*.

152.   **Michigan:** By reason of the foregoing, MasterCard has violated Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

153.   **Massachusetts:** By reason of the foregoing, MasterCard has violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq*.

154.   **Minnesota:** By reason of the foregoing, MasterCard has violated Minnesota Annotated Statutes §§ 325D.49, *et seq*.

155.   **Mississippi:** By reason of the foregoing, MasterCard has violated Mississippi Code Annotated §§ 75-21-1, *et seq*.

156.   **Missouri**: By reason of the foregoing, MasterCard has violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.

157.   **Nebraska:** By reason of the foregoing, MasterCard has violated Nebraska Revised Statutes Annotated §§ 59-801, *et seq*. and Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*.

158.   **Nevada:**  By reason of the foregoing, MasterCard has violated Nevada Revised

Statutes Annotated §§ 598A.010, *et seq.*

159. **New Hampshire:** By reason of the foregoing, MasterCard has violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*

160. **New Mexico:** By reason of the foregoing, MasterCard has violated New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

161. **North Carolina:** By reason of the foregoing, MasterCard has violated North Carolina General Statutes §§ 75-1, *et seq.*

162. **North Dakota:** By reason of the foregoing, MasterCard has violated North Dakota Century Code §§ 51-08.1-01, *et seq.*

163. **Oregon:** By reason of the foregoing, MasterCard has violated Oregon Revised Statutes §§ 646.705, *et seq.*

164. **Rhode Island:** By reason of the foregoing, MasterCard has violated Rhode Island Gen. Laws Ann. §§ 6-36-1, *et seq.*

165. **South Dakota:** By reason of the foregoing, MasterCard has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

166. **Tennessee:** By reason of the foregoing, MasterCard has violated Tennessee Code Annotated §§ 47-25-101, *et seq.*

167. **Utah:** By reason of the foregoing, MasterCard has violated Utah Code §§ 76-10-911, *et seq.*

168. **Vermont:** By reason of the foregoing, MasterCard has violated Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.*

169. **West Virginia:** By reason of the foregoing, MasterCard has violated West Virginia Code §§ 47-18-1, *et seq.*

170.   **Wisconsin**: By reason of the foregoing, MasterCard has violated Wisconsin Statutes §§ 133.01, *et seq*.

171.   As a direct and proximate result of defendant MasterCard's unlawful conduct, Plaintiffs have been injured in their businesses and property in that they paid supracompetitive Interchange Fees due to the unlawful conduct of defendant and their co-conspirators.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against defendants and request that the Court:

A.   Declare that defendants have violated the federal antitrust laws, or, in the alternative, state antitrust and unfair competition laws, in each of the ways alleged above;

B.   Contingent on whether the class settlement in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, MDL 1720 (E.D.N.Y.) is finally approved, issue permanent injunctive relief enjoining defendants, their directors, officers, employees, agents, successors and members from continuing the anticompetitive conduct alleged above and requiring them to take affirmative steps to dissipate the effects of their prior violations;

C.   Order each defendant to pay Plaintiffs three times the damages caused by that defendant and its co-conspirators and sustained by Plaintiffs from January 1, 2004 through November 27, 2012;

D.   Order each defendant to pay Plaintiffs three times the damages caused by that defendant and its co-conspirators and sustained by Plaintiffs after November 27, 2012 in the event that the release and/or injunctive relief associated with the Rule 23(b)(2) settlement class in the Interchange Fee MDL is invalidated or modified in any way;

E.   Order the defendants to pay Plaintiffs the costs of this suit, including its reasonable attorneys' fees and costs; and

44

F.  Order such other and further relief as the Court deems just and proper.

### XIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: November 18, 2013

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: _____
       Jason A. Zweig (JZ-8107)
555 Fifth Avenue
Suite 1700
New York, New York 10017
Tel: (212) 856-7227
Fax: (917) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
George W. Sampson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

Paul E. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
pes@sperling-law.com

Joseph M. Vanek
David P. Germaine
**VANEK, VICKERS & MASINI, P.C.**
55 West Monroe Street, Suite 3500
Chicago, Illinois 60603
Tel: (312) 224-1500
Fax: (312) 224-1510
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

*Counsel for Plaintiffs JetBlue Airways Corporation
and Live TV, LLC.*

45